UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20063-CR-ALTMAN

**UNITED STATES OF AMERICA**,

    Plaintiff,

v.

**CHRISTOPHER GRANT PROBY**,

    Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court on the Motion for Severance of Defendants, filed on April 30, 2019 by the Defendant, Christopher Grant Proby ("Motion") [ECF No. 47]. The United States of America (the "Government") filed its Response on May 3, 2019 ("Response") [ECF No. 51]. Proby filed his Reply on May 6, 2019 ("Reply") [ECF No. 52]. The Court held a hearing on the Motion on May 7, 2019, at which both parties made their oral arguments. The Court has carefully considered the parties' written submissions, the arguments made at the hearing, and the applicable law. For the reasons stated in open court and in this Order, the Motion is hereby **DENIED**.

### BACKGROUND

On February 1, 2019, Proby was charged by Indictment with three (3) violations of federal law: In Count 1, Proby and two co-Defendants, Jamal Lamar Head and Keon Travy Glanton, are charged with conspiring to commit Hobbs Act robberies; in Count 4, Proby, Head, and Glanton are charged with committing a Hobbs Act robbery that occurred on July 11, 2018;

and, in Count 5, Proby, Head, and Glanton are charged with brandishing a firearm in furtherance of the July 11th robbery (the "Indictment") [ECF No. 1 at 1-4].

The Indictment separately charges Head with committing a Hobbs Act robbery on July 9, 2019 (Count 2) and with brandishing a firearm in furtherance of that robbery (Count 3). *Id.* at 2-3. Count 6 of the Indictment charges Head and Glanton with committing a Hobbs Act robbery on July 12, 2019. *Id.* at 4-5. Count 7 charges Head and Glanton with kidnapping the victim of the July 12th robbery in a manner that resulted in the victim's death. *Id.* at 5. Count 8 charges Head and Glanton with carjacking the victim of the July 12th robbery in a manner that resulted in the victim's death. *Id.* at 6. Count 9 charges Head and Glanton with discharging a firearm in furtherance of the July 12th robbery. *Id.* In Count 10, the Indictment charges Head and Glanton with causing the death of a victim in the course of committing the gun crime charged in Count 9. *Id.* at 7. Count 11 charges Head, a convicted felon, with the unlawful possession of a firearm and ammunition. *Id.* at 7. And Count 12 charges Glanton with arson. *Id.* at 8. Counts 7, 8, and 10 each carry the possibility of a death sentence. *Id.* at 10-15.

In short, the Government alleges that, in July of 2018, Proby, Head, and Glanton participated in a conspiracy to lure unsuspecting plumbers to abandoned residences, where the plumbers were robbed at gunpoint. In each of the robberies, the Defendants used a female—sometimes a minor—to place the service call to the plumbing company. During the final robbery, in which Proby did *not* participate, the plumber who responded to the call was robbed, kidnapped, carjacked, and murdered.

## THE LAW

Federal Rule of Criminal Procedure 8(b) provides as follows:

>  (b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The Eleventh Circuit has repeatedly held that "the rule about joint trials is that 'defendants who are indicted together are usually tried together.'" *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011) (quoting *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007)); *see also, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 537-38 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); *United States v. Magdaniel–Mora*, 746 F.2d 715, 718 (11th Cir. 1984) ("To repeat the familiar, persons indicted together ordinarily should be tried together."). "That rule is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'" *Lopez*, 649 F.3d at 1234 (quoting *United States v. Beale*, 921 F.2d 1412, 1428 (11th Cir. 1991)); *see also United States v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005).

The Eleventh Circuit has made clear that "[j]oint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *Lopez*, 649 F.3d at 1234. Similarly, as the Supreme Court has observed, "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendant who has the advantage of knowing the prosecution's case beforehand." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

3

"To be sure, the rule about a joint trial in conspiracy cases is not quite ironclad." *Lopez*, 649 F.3d at 1234 (quoting Fed. R. Crim. P. 14(a)) ("If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant . . . the court may . . . sever the defendants' trials, or provide any other relief that justice requires."). But, as the Eleventh Circuit has held, "[t]he exceptional circumstances justifying a deviation from the rule" that defendants who are indicted together should be tried together "are few and far between." *Id*.

For this reason, to justify a severance under Rule 14, the Defendant must first "carry the 'heavy burden of demonstrating that compelling prejudice would result' from a joint trial." *Id*. (quoting *Browne*, 505 F.3d at 1268 (alteration adopted)). "To show compelling prejudice, a defendant must establish that a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice—jury instructions or some other remedy short of severance will not work." *Id*. In this respect, the Eleventh Circuit has insisted that "[t]he potential for prejudice from a joint trial is not enough, and not just any kind of prejudice will do." *Id*. So, for instance, "[m]utually antagonistic defenses are not prejudicial per se." *Zafiro*, 506 U.S. at 538; *see also United States v. Blankenship*, 382 F.3d 1110, 1122 (2004) ("[*Zafiro*] specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced."). And "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "Anything that increases the likelihood of a conviction 'prejudices' the defendant in the ordinary sense of the word, but in severance law, 'prejudice' is not used in the ordinary sense of the word." *Lopez*, 649 F.3d at 1234.

In sum, a defendant seeking a severance must establish "a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury

4

from making a reliable judgment about guilt or innocence' even if limiting instructions are given." *Id*. at 1234-1235 (quoting *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005)); *cf. United States v. Talley*, 108 F.3d 277, 280 (11th Cir. 1997). "Aside from those two situations, jointly indicted defendants are not entitled to a severance." *Id*.

## ANALYSIS

The Government has properly joined the charges against the three Defendants, who are alleged to have "participated in the same act or transaction"—viz. the acts charged in Counts 1, 4, and 5. *See* Fed. R. Crim. P. 8(b). And the facts of this case prove the rule—"even more pronounced" in conspiracy cases—that "defendants who are indicted together" should be "tried together." *Lopez*, 649 F.3d at 1234 (quotation omitted). As the Government explains,

> At trial, in order to prove the allegations in Counts 1, 4, and 5 of the Indictment, which are charged against all three Defendants, the United States intends to present the testimony of: Minor 1, who was used by Proby, Glanton, and Head to lure victim D.S. to the site of the July 11 robbery in Riviera Beach, and who is also expected to testify about horrific sexual abuse that she suffered at the hands of Proby and other men with whom Proby forced her to have sex for money, as this evidence is inextricably intertwined with the charged crimes; two additional young women—one a minor who had sex with Defendant Head—who have critical testimony corroborating Head's and Glanton's involvement in the robbery; victim D.S., who will tell the jury about the vicious and traumatic assault inflicted on him when he was repeatedly pistol whipped during the robbery; and several law enforcement officers, crime scene personnel, forensic analysts, and other witnesses who will testify to the work that they did in analyzing evidence seized from the crime scene, as well as electronic and other evidence. In addition to the evidence relating directly to the July 11 robbery of D.S., the United States will present extensive evidence pertaining to cell phone communications, cell phone toll analysis, social media evidence, cell site location, testimony, and other evidence going beyond July 11 in order to show the communications and conspiratorial relationship between Proby and his co-defendants. Additionally, the United States would have to present a substantial amount of evidence—if not all of the evidence—about the July 12 robbery and murder because multiple items stolen from the victim of the July 11 robbery were found in a car along with the body of the victim of the July 12 robbery.

Response 10.

The Court will not force either D.S., the victim of a violent robbery, or Minor 1—who may well have been subjected to repeated acts of sexual abuse—to testify at two different trials more than one year apart. *See, e.g.*, *Richardson*, 481 U.S. at 210 (noting the trauma that victims endure when they are forced to testify more than once). Nor would it serve the twin goals of judicial efficiency or verdict consistency to require the Government to twice present the same evidence about the same conspiracy involving the very same individuals. *See Lopez*, 649 F.3d at 1234 (joint trials "reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources"); *Browne*, 505 F.3d at 1268. For these reasons, the Court finds that Proby has not carried his "heavy burden" here.

Proby makes three arguments in support of his Motion. *First*, he says that he "is severely prejudiced by a joint trial because his rights to a speedy trial, by an impartial jury, will be desecrated." Motion 3. Specifically, he notes that "Head and Glanton's capital offenses will elongate the jury selection and trial to the point of completely eroding [his] constitutional right to a speedy trial." *Id*. *Second*, he points out that "Head and Glanton's capital offenses bring a death qualified jury to the table," and contends that "a [death-qualified] jury . . . is far from impartial for Proby's noncapital offenses, and not representative of the community." *Id*. *Third*, he argues that "the potentially gruesome evidence of capital violence against Head and Glanton will severely prejudice [his] defense in front of the jury." *Id*. None of these arguments rises to the level of "compelling prejudice." *See, e.g.*, *Lopez*, 649 F.3d at 1234; *Browne*, 505 F.3d at 1268.

*1. Speedy Trial*

Proby first argues that trying him together with two death-eligible co-defendants will, because of the protracted mitigation inquests that will inevitably ensue, significantly delay his trial and, by extension, violate his Sixth Amendment rights.[1]

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Supreme Court has set out four factors for courts to consider in determining whether a particular amount of pre-trial delay violates a defendant's Sixth Amendment rights: "[1] [the] length of delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "Unless the first three *Barker* factors all weigh heavily against the government, the defendants must demonstrate actual prejudice." *United States v. Knowles*, 390 F. App'x 915, 929 (11th Cir. 2010) (internal quotation marks omitted and alterations adopted) (quoting *United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985)).

"[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 531. So, for instance, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id*. Either way, "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id*. at 530-531. And the Eleventh Circuit has held that "[a]

---

[1] Notably, at oral argument, Proby affirmatively disclaimed any statutory argument under the Speedy Trial Act, 18 U.S.C. § 3161. In a separate Order Setting Trial [ECF No. 61], the Court nevertheless analyzes the factors set out in the Speedy Trial Act and concludes, pursuant to 18 U.S.C. § 3161(h)(7), that the ends of justice served by a continuance outweigh the best interests of the public and the Defendants in a speedy trial.

7

delay becomes 'presumptively prejudicial' as it approaches one year" from the earlier of the arrest or indictment. *United States v. Knight*, 562 F.3d 1314, 1323 (11th Cir. 2009).

In assessing the Government's reasons for the delay, courts should consider whether the delay is merely a tactic employed by the Government to prejudice the defense—which "should be weighted heavily against the government"—or whether, instead, there is "a valid reason, such as a missing witness." *Barker*, 407 U.S. at 531. In analyzing prejudice to the defendant, the Supreme Court has directed courts to consider the three interests protected by the speedy trial right: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id*. at 532. Importantly, the Eleventh Circuit "has consistently held that conclusory assertions of prejudice, including unsubstantiated allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice." *United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1996) (citing *United States v. Young*, 906 F.2d 615, 620 (11th Cir. 1990) and *United States v. Russo*, 796 F.2d 1443, 1451 (11th Cir. 1986)).

The Government concedes that the Defendant has asserted his right to a speedy trial (the third *Barker* factor), but correctly points out that Proby's pre-trial delay "claim is premature and speculative because the constitutional right to a speedy trial is not triggered '[u]ntil there is some delay which is presumptively prejudicial.'" Response 11 (quoting *Barker*, 407 U.S. at 530-531). In the Eleventh Circuit, "[a] delay becomes 'presumptively prejudicial' as it approaches one year" from the earlier of the arrest or indictment. *Knight*, 562 F.3d at 1323. Proby was indicted on January 31, 2019—some six weeks before his March 15th arrest. *See generally* Indictment. In other words, as of the date of this Order, Proby's delay has not approached five months—let

alone one year. Accordingly, "there is no necessity for inquiry into the other factors that go into the [*Barker*] balance." *Barker*, 407 U.S. at 530-531.

Proby does not dispute any of this. Instead, he asks the Court to act as if his delay *had* approached one year because, if his motion is denied, his trial will not, in fact, take place within a year of his indictment. But this is just not so. While his co-defendants' capital inquests will, it is true, significantly prolong Proby's trial schedule, many things might happen over the next eight months: Proby, for one, could plead guilty; all of the Defendants, in fact, could choose to plead guilty; or the Government could elect not to seek the death penalty against Head and Glanton, in which case the trial schedule in this case will be significantly circumscribed.[2] In any of these scenarios—none of them implausible—Proby's pre-trial delay will not have exceeded one year. In short, because Proby's delay has not approached one year, the Court can reject Proby's claim of pre-trial delay without addressing the remaining *Barker* factors. *Knight*, 562 F.3d at 1323.

But, even if the Court were to agree with Proby that it should review the Motion as if his pre-trial delay had actually approached one year, Proby's Motion would still be denied. In this hypothetical scenario, after all, Proby would only have satisfied the first and third *Barker* factors. The second *Barker* factor, however, would still weigh overwhelmingly in the Government's favor. Indeed, the "reason[s] for the delay" in this case are compelling and manifold. Separate trials would require the Government, in the Supreme Court's words, to "bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-

---

[2] In its Order Setting Trial [ECF No. 61], the Court made clear that, if the Government decides not to seek the death penalty against Head and Glanton, the Court will pare down the trial schedule substantially.

9

tried defendant who has the advantage of knowing the prosecution's case beforehand." *Richardson*, 481 U.S. at 210. The Government's reasons are particularly compelling where, as here, it is undisputed that at least two victims—D.S. and Minor 1—would be forced to testify multiple times about what may well be the most traumatic events of their lives. Response 10. And, because Count 1 charges all three Defendants with participating in a common conspiracy, severing these trials would require the Government to *twice* present voluminous amounts of cell phone and other evidence—including the testimony of a second sexually abused minor—to connect Proby to the illegal course of conduct in which Head and Glanton were allegedly engaged.

Because one of the first three *Barker* factors weighs heavily in the Government's favor, Proby must prove "actual prejudice." *Knowles*, 390 F. App'x at 929; *cf. Mitchell*, 769 F.2d at 1547. Aside from making plain that the denial of his motion would result in an extended term of pre-trial incarceration—a factor the Court does not treat lightly[3]—Proby makes only one concrete averment about the "actual prejudice" he will suffer if his Motion is denied: that Minor 1, who, after initially exculpating him has now become a central witness in the Government's case against him, may run away.

---

[3] The Court also finds that any additional pre-trial delay would naturally increase the "anxiety and concern of the accused"—the second factor courts should consider in determining whether a defendant has demonstrated "actual prejudice." *Barker*, 407 U.S. at 532. But any defendant whose pre-trial incarceration is delayed will inevitably be able to show that the delay added to his pre-trial incarceration and increased his anxiety. If these two factors were dispositive, therefore, any delay approaching one year would necessarily violate a defendant's speed trial rights—thereby rendering the remaining *Barker* factors superfluous and, in many complex cases involving multiple defendants, reversing the well-established rule that joint defendants should be tried together. To avoid this implausible result, the Court finds that the critical question under the "prejudice" prong of the *Barker* test is whether the Defendant can show that his defense will be impaired. *Id*.

But counsel's repeated use at oral argument of the highly conjectural "I don't know," "might," and "may be" with respect to this issue strongly belie his contention that his speculative concerns about Minor 1's future behavior *have caused*, or are likely to cause, Proby any "actual prejudice." *See Hayes*, 40 F.3d at 366 (citing *Young*, 906 F.2d at 620 and *Russo*, 796 F.2d at 1451) (noting that "conclusory assertions of prejudice, including unsubstantiated allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice"). In fact, far from showing any "actual prejudice," Proby's argument suggests that the delay might help his defense. After all, given the centrality of Minor 1's testimony to the Government's allegations against Proby, her absconding would seem to significantly weaken, if not entirely eviscerate, the Government's case against him. In sum, Proby has failed to demonstrate the kind of "actual prejudice" that would warrant severing his trial from that of his co-defendants.

   2. *Spillover Evidence*

Proby's next argument—that "potentially gruesome evidence of capital violence" against his co-defendants might "make the jury incapable of reliably determining [his] guilt or innocence," (Motion 3)—is squarely foreclosed by the Eleventh Circuit's holding in *Lopez*. In that case, Defendants Varela and Lopez, who were not present when their co-defendants perpetrated a horrific quadruple homicide, argued "that a severance should have been granted" because "the joint trial brought into evidence the fact that two of their coconspirators had murdered a fellow drug dealer, his wife, and their two young children." *Lopez*, 649 F. 3d at 1238. When Varela and Lopez's severance motions were denied, their trial inevitably included "autopsy reports and photographs of the dead, bullet-riddled victims and testimony about how they were killed." *Id*. In rejecting Varela and Lopez's appeals, the Eleventh Circuit acknowledged that "[n]o defendants would want that evidence to come before the jury at their

11

trial, even if it were made clear that they did not participate in the murders." *Id*. But, the court went on, "[w]hat defendants want . . . is not the test." *Id*. Instead, the Court said:

> In gauging the prejudicial effect and the spillover risk posed by the evidence about the murders, it is important to keep in mind that the district court repeatedly instructed the jury to consider evidence against only those defendants that the evidence implicated and to assess the guilt or innocence of each defendant separately . . . [i]n one phrasing or another the court gave cautionary instructions once to the entire venire, once or twice to each of the 18 venire panels, a few times during trial for specific testimonial evidence, and four more times in its final instructions. *See United States v. Hill*, 643 F.3d 807, 828-30 (11th Cir. 2011) (rejecting a severance contention where "[a]lthough the district court, in the interests of efficiency and judicial economy, understandably refused to give the jury a curative instruction every time evidence irrelevant to the charges against [the appellant] was introduced, the court did give the jury a closing instruction that it must consider the evidence separately as to each defendant with respect to each charge."); *United States v. McNair*, 605 F.3d 1152, 1205 n.73 (11th Cir. 2010) (noting that jury instructions, such as those in which the district court "charged the jury to consider each defendant 'separately and individually' and reminded them that 'each defendant is on trial only for the specific offenses or offense charged against such defendant in the indictment[,]' . . . substantially mitigate the risk of spillover prejudice."); *United States v. Cross*, 928 F.2d 1030, 1039 (11th Cir. 1991) (finding no prejudicial effect from spillover evidence where "the trial court specifically charged the jury that, 'each offense and the evidence pertaining to it should be considered separately,' and that 'the case of each defendant should be considered separately and individually.'"); *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) ("The possible prejudicial effects of such disparity can be significantly alleviated if the trial judge is careful to instruct the jury that it must consider the evidence against each defendant on a separate and independent basis.").

*Lopez*, 649 F.3d at 1239-40. [4] The Court will likewise repeatedly instruct the jury in this joint trial that "each offense and the evidence pertaining to it should be considered separately,"

---

[4] "The other factor" that persuaded the Eleventh Circuit "that the introduction of the evidence proving that Sanchez and Troya murdered the Escobedos did not prevent the jury from reliably determining the guilt of Varela and Lopez on the charges against them is the nature and extent of evidence proving Varela and Lopez were guilty of those charges." *Lopez*, 649 F.3d at 1240. At this stage of the proceedings, of course, this Court is not in a position to make any similar judgments about the "nature and extent" of the evidence the Government intends to introduce against Proby. Suffice it to say, however, that Proby will be entitled to re-raise this motion at a

and that "the case of each defendant should be considered separately and individually." *Cross*, 928 F.2d at 1039. The Court must presume that juries will follow the instructions that are given to them. *United States v. Siegelman*, 640 F.3d 1159, 1184 (11th Cir. 2011); *United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011); *cf. United States v. Bailey*, 123 F.3d 1381, 1402 (11th Cir. 1997).

Indeed, Proby's argument for a severance in this case is, for at least two reasons, significantly weaker than the claims made on appeal by Varela and Lopez. *First*, while evidence relating to any deceased victim's homicide will undoubtedly be gruesome, the evidence here simply cannot compare to the photographs and autopsy reports introduced in *Lopez* of a murdered mother lying alongside her slain young children. If the potential "spillover prejudice" from that evidence was insufficient to justify a severance in *Lopez*, Proby's argument that photographs of the deceased victim's body will preclude him from receiving a fair trial here cannot succeed. *Second*, it is not at all clear that the evidence of the July 12th homicide would be excluded from Proby's separate trial, even if his motion to sever were granted. After all, much of the physical evidence of the July 11th robbery—in which Proby *is* alleged to have participated—was found on July 12th alongside the deceased victim's body and in the victim's burnt car.[5] To the extent that this evidence further connects Proby to Head and Glanton—who are alleged to have committed the murder—it is highly relevant to the conspiracy charged in Count 1.

In any case, even if the evidence from the murder scene were not intrinsic to the conspiracy charged in Count 1, given the interconnectedness of the evidence, the ongoing

---

later time, when the precise contours of the Government's case against him can be more accurately established.
[5] This includes the two Arizona iced tea cans that were purchased with a credit card that was stolen from D.S. on July 11th; D.S.'s bank statement; and D.S.'s driver's license and credit cards.

association among the Defendants, and the striking commonalities between the various robberies, the evidence of the homicide would be admissible at Proby's separate trial because it is inextricably intertwined with the offenses charged in Counts 1, 4, and 5. *See e.g.*, *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (citing *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995) ("Evidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense."); *McLean*, 138 F.3d at 1403 (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context . . . is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime . . . to complete the story of the crime for the jury."); *see also United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007) (in a firearm possession case, evidence that the defendant was about to use the illegally possessed firearm to commit a bank robbery was admissible as inextricably intertwined, even though the defendant was not charged in the bank robbery); *United States v. Wright*, 392 F.3d 1269 (11th Cir. 2004) (affirming admission of testimony, in a firearm possession case, that the defendant resisted arrest because the encounter between the defendant and the officers "gives the jury the body of the story, not just the ending"); *United States v. Thomas*, 242 F.3d 1028 (11th Cir. 2001) (holding that, in a firearms possession case, proof that the defendant sold drugs from the same location where the firearms were found was admissible as inextricably intertwined evidence); *United States v. Fortenberry*, 971 F.2d 717 (11th Cir. 1992) (in a firearm possession case, the defendant's use of the illegal firearm to commit a double homicide was admissible as

inextricably intertwined evidence, even though the defendant was not on trial for the double homicide).

Accordingly, Proby's "spillover" argument does not establish "compelling prejudice" and is thus insufficient to justify a severance.

*3. A Death-Qualified Jury*

Proby's third argument—that he would be prejudiced by a trial in front of a death-qualified jury—is similarly foreclosed by the following excerpt from *Lopez*:

> This joint trial was different from most because it resulted in the jury being death-qualified, which it would not have been if Varela and Lopez had been tried separately from Sanchez and Troya. But having guilt determined by a death-qualified jury is not legally cognizable prejudice. *See Buchanan v. Kentucky*, 483 U.S. 402, 420, 107 S.Ct. 2906, 2916, 97 L.Ed.2d 336 (1987). In *Buchanan*, the Supreme Court held that, even assuming death-qualified juries are conviction prone, there is no constitutional right to have guilt determined by a jury that has not been death-qualified. *Id*. at 420, 107 S.Ct. at 2916. On the basis of *Buchanan*, the Fourth and Fifth Circuits have rejected any *per se* rule requiring severance when a noncapital defendant is tried alongside a capital defendant. *See United States v. Lighty*, 616 F.3d 321, 351 (4th Cir. 2010) ("A *per se* rule requiring severance each time a capital defendant and a non-capital defendant are charged with the same crimes certainly would undermine [the Supreme Court's] stated preference [for joint trials]."); *United States v. Causey*, 185 F.3d 407, 417 (5th Cir. 1999) ("The Supreme Court has rejected the argument that a non-capital defendant cannot receive a fair trial when tried jointly with capital defendants."). We agree with those two circuits.

*Lopez*, 649 F.3d at 1237. Notably, at oral argument, Proby's counsel agreed with the Court's suggestion that this third argument was precluded by the holding in *Lopez*.

## CONCLUSION

Because Proby has failed to "carry the 'heavy burden of demonstrating that compelling prejudice would result' from a joint trial," *Lopez*, 649 F.3d at 1234, the Court hereby **ORDERS AND ADJUDGES** that the Motion **[ECF No. 47]** is **DENIED**.

15

CASE NO. 19-20063-CR-ALTMAN

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 4th day of June 2019.

**ROY K. ALTMAN**  
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record